Claude E. LONG, Plaintiff,

v.

FORD MOTOR COMPANY, Defendant.

Civ. A. No. 37429.

United States District Court,
E. D. Michigan, S. D.

Nov. 9, 1972.

William D. Haynes, Haynes, Donnelly & Tilles, Detroit, Mich., for plaintiff.

James R. Jackson, Joseph A. O'Reilly, Ford Motor Co., Dearborn, Mich., for defendant.

## OPINION

FEIKENS, District Judge.

Claude E. Long, a black man, is suing his former employer, Ford Motor Company, pursuant to 42 U.S.C. § 1981 for wrongful termination of his employment.[1] Long's claim is that his employment was terminated at least in part because of his race.

The question presented here is one of the more pressing in the automobile industry (which may be the most significant economic force in this district). More specifically, the hiring of black people into lower and middle-management positions in the automobile companies is at the leading edge of the struggle for equal employment opportunities for members of all races. In positions held by hourly workers, the problem of racial discrimination has been alleviated somewhat by a greater consciousness of the problems in this area on the part of management and the union representatives. This awareness has also accelerated the movement in recent years of black people into higher-level positions in the unions. Upper-level management has also shown a real consciousness of the problems in this area.

In a letter under date of January 17, 1968, Mr. Henry Ford II, writing to all members of the Ford Motor Company management group, said in this regard (in part):

"Equal opportunity is one of Ford Motor Company's oldest, firmest and most basic policies. The purpose of this letter is to call on each of you to give that policy your full and active support, and to put it into practice in new ways and with a new sense of urgency.

"Our goal is to do all we realistically can to give people who have been held back by prejudice and poverty a chance to earn a decent life. . .

"We can continue to *improve our internal training programs* and provide leadership and support to public and private community programs to seek out and develop talent abilities that may be productively employed in business and industry. . .

"By helping people to help themselves, we can help to cure a social cancer that threatens the vitality and peace of the communities. where we do business.

. . . . . .

"New approaches will bring new problems, but I know we have the management ability to solve them. . . ." (See Plaintiff's Exhibit 4.)

Lower and middle-management personnel still possess a great lack of awareness of the problems of racial discrimination and the right to equal employment opportunity. This lack was demonstrated during the trial by the testimony of virtually all those Ford employees (both black and white) that they were, in effect, "color blind."

This testimony indicates that they did not understand what Mr. Ford had said to them. People who say that they are color blind and stop there either do not understand or do not care to understand the problem of racial discrimination. Ford did not tell his management group to be "color blind"; he told them to be "color conscious." And he said much more. He said that that consciousness should carry with it the equally important goal of thorough job training. This testimony indicates that these management people—contrary to the position of their higher management—have little awareness of the need for *positive* steps to advance black people into the lower and middle-management levels. They seem willing, even, to accept token integration of these levels of management so long as this does not require

[1] 42 U.S.C. § 1981: "All persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens. . . . . ."

changes in entrenched attitudes and practices.

What must be understood in an analysis of this case is that a black man should not be hired just because he is black. A black person who is hired solely for appearance sake and is inexperienced and not given thorough job training is likely to fail. If that occurs and he is then fired, one may conclude that just as he was hired because he was black, so he was fired because he was black.

This community has seen black men, some with college degrees, placed into management positions in which they had no experience and for which they received little or no training. As a result there were resignations or firings and the common black man's complaint is then that this occurred because of race.

It is against this background that the facts of this case must be judged.

■ Claude Long applied for a position with Ford on July 5, 1967. He is a graduate of Michigan State University with a Bachelor of Science degree in Police Administration.

He began working at the Ford Rouge complex approximately two weeks later. Although Long began as a production foreman, his testimony indicated that he accepted this position because a Ford spokesman had told him that he would have to take such a position to "gain experience" in the way Ford did things prior to becoming a labor relations representative (which was the position Long testified that he was more interested in). This contention is borne out by the fact that Long's application for employment with Ford indicated that his objective was to "get into the management area at Ford Motor."

As a foreman, Long received three "satisfactory" performance reviews with various notations as to specific duties which he was or was not performing adequately. The testimony and exhibits indicate that Long related well to the employees under his supervision (most of whom were black) but that he was not what might be termed a "by the book" foreman.

On January 2, 1969, Long was given his first "unsatisfactory" performance review by General Foreman R. Kaul.

Shortly thereafter, Long filed a complaint with the Michigan Civil Rights Commission alleging that he was harassed, given an unfair performance review, and that he was denied a better job placement because of his race.

This complaint was withdrawn, prior to investigation, because Long was transferred to the Industrial Relations Department in May of 1969.

This transfer was accomplished through the efforts of Harvey Proctor, a black man. Proctor, who had just moved from the position of Industrial Relations Manager at the Frame Plant to the same position at the Stamping Plant, suggested to his successor at the Frame Plant, Rex Bremer, a white man, that Bremer might consider Long for an upcoming vacancy at the Frame Plant. This suggestion resulted from a discussion between Proctor and Long about the possibility of Long's getting into labor relations work.

The parties greatly differ over whether Bremer's hiring of Long was as a result of Long's civil rights complaint (a "conciliation" of the complaint). This court does not see this question as being particularly crucial to the decision of this case, and thus it need not be decided.

Long was interviewed by Bremer. Bremer testified that he hired Long as a favor to Proctor.

Prior to the time that Bremer appointed Long to the wage analyst position at the Frame Plant there were two people handling wage analyst work, a Thomas Malizia and a John Hastie. What was later to become the work of Long was divided between them.

Long took over the position that Hastie had held. His supervisor was a Mr. Haney. Long's job training was scanty. Malizia was supposed to teach him the job, but it was the testimony of Long

and his co-workers that Malizia's assistance in his learning the job was minimal. Long's supervisors, most notably Bremer, thought that Long's training by Malizia had been adequate. Whether this reflects inadequate information or not this court need not decide, but this court does find that Long received little training. Malizia, it should be noted, was given an "early retirement" because *he* was not performing his duties adequately.

Upon Malizia's retirement, Long took over those duties as well as his existent duties. During this period, Haney was replaced as Long's supervisor by Mr. J. Alphonso Brown. There was some indication that Haney was replaced because he and Bremer (his supervisor) "had difficulties."

Brown rated Long "satisfactory plus" in his only performance review of Long. Brown further indicated that Long was a reasonably decent employee who tried very hard. Brown admitted that Long had problems in the position because he was "project oriented" and had difficulty co-ordinating the numerous functions of his wage analyst position. It was also pointed out, though, that this was not unusual in the wage analyst position and that Long's predecessor, Malizia, had "close to an all-time plant high in errors."

It was apparently Bremer's policy to "rotate" personnel within the department. This was to familiarize an employee with as many of the job positions as possible. However, this might have kept employees from ever becoming completely familiar with any given position. Presumably, pursuant to this rotation policy, Long became Suggestions Program Administrator. Part of the work of this position was to promote Ford's "Idea Days." As a part of this program, employees submitted suggestions to reduce production costs. The administrator would collect these suggestions, have them evaluated by the appropriate department, and send them on to the Cost Analyst Department. The administrator was also responsible for seeing that employees received "rewards" provided by the company for submitting the suggestions. Although Long again received some criticism for his handling of the paperwork in this position, it is apparent that his performance was satisfactory, for he received an award for the submission of a high number of suggestions. It is noteworthy that at the suggestion of Bremer, Long "held up" suggestions prior to the beginning of "Idea Days," so that they could count toward the plant total during the promotion. This led to some of the problems encountered by him in processing the suggestions which were sequentially numbered since the "holding back" confused the number sequence.

The primary reason for the award, however, was Long's willingness to go onto the assembly line. This involved talking to the supervisors and urging them to encourage and help their men submit suggestions. Long also talked to the hourly workers themselves—some of whom could hardly read and write—and got them to tell him their ideas which he would then write up and submit in the employee's name. This involved talking to the workers while on their breaks or while working and learning from them their practical job knowledge, or "mother wit."

In April 1970, Long was transferred from the Suggestions Program back to a "medical leave" position. In this position, Long was made responsible for the Medical Leave Program. The program was being transferred from centralized administration (Gate 2) to individual plant administration. The supervisory personnel again differ from Long's co-workers in assessing the amount of training Long received. The more credible testimony is that Long received little or no job training as to the matter of medical leaves.

He was then put back into the regular wage analyst position. He took over from Peter O'Malley, who had replaced him when he (Long) had taken over the Suggestions Program. Harold Ball, a

black man, was his immediate supervisor. This was approximately June 8, 1970.

Long stated that the training he received on the various jobs was essentially "no training at all." And this statement was corroborated by the evidence.

Due to his brief tenure as a wage analyst previously, Long asked that he be given instructions by O'Malley. He was given two hours. The testimony indicates that it takes about a month to learn the basics of the job. Because of the inadequacy of training and volume of work, Long fell behind in his work. He advised his supervisor, Ball, of this and was told that he need not worry.

Long went on vacation from June 28, 1970, to July 13, 1970, and during this period his predecessor at the job, P. K. O'Malley, replaced him.

Upon return from his vacation, in a letter dated July 24, 1970, Long received a written reprimand from his supervisor criticizing his work during the period from June 16, 1970, through July 24, 1970. It was specifically noted that this letter was to go into Long's personnel jacket. At about the same time (July), Long's former supervisor, Alphonso Brown, warned, "Long, find yourself another job because Rex [Bremer] is out to get you." The testimony indicates that mistakes by Long during this period—though similar to mistakes made by others who held the job—were brought to the attention of either Ball or Bremer. Others who did hold the position (before Long) or have held it (since Long) had been given the opportunity to correct their mistakes.

On October 26, 1970, Long received an "unsatisfactory" performance review. No one else in the department had received less than an "excellent" performance review from Harold Ball. Ball also had given Long, and only Long, a letter of reprimand after only slightly more than two weeks of actual on-the-job performance. (Ball testified further that he had no idea whether the job was up to date when Long took it over).

Long wrote a rebuttal statement and had it placed in his personnel file. He was then given the opportunity to resign or to be fired. He resigned.

It is clear to this court that Claude Long was a man who was concerned with the position of the hourly workers. He was a highly verbal person who related well to these people.

His immediate supervisor, Harold Ball, also a black man, was a different type of person. He related well to Bremer, his immediate supervisor. He seemed to know how to work for Bremer.

One witness described Bremer as being "tough to work for . . . he wanted things done his way period. . . re-do them and re-do them until they were right."

Bremer perhaps used "objective" criteria for evaluating the work of Long, but the criteria were not used objectively. Long was behind in his paperwork, but so were others who were not fired. Bremer demanded conformity "with his way of doing things" from everyone, but from Long he demanded stricter conformity.

But what is also clear to this court is that Long, although a capable man, was not given adequate job training. He was shifted from job to job, and in his final job—that of a wage analyst—it is evident that the necessity to train him thoroughly was simply not undertaken. Long had asked if two days could be spent with O'Malley prior to his taking over that position so that he would have some idea of what was to be done. Brown said to him, "You will have to make time to learn that job. I expect you to keep up your present assignment and learn your other job also." He was given only two hours of instruction.

It is this fact that is controlling in this situation. It appears to this court that Long, a black man, simply was not adequately trained, and thus he could not perform adequately.

Care must be taken to understand what this court means by "job adequa-

cy" or "performance adequacy." It must be recognized that irrespective of race, there are people who simply are unable to perform adequately. This is not that situation. Black people, as a result of inferior education and housing, and other deprivations, have historically been denied equal employment opportunities. Where they have begun to overcome this inequality through education, integration, and new opportunities, merely hiring a person into a new job is not equal employment opportunity. If these people are not given adequate job training and are, as a result, terminated, then unequal employment opportunity still results. This imbalance is a real factor in racial discrimination. Racial discrimination in employment will not end until such people are given thorough job training so that they can perform adequately. Inadequate job training in a situation such as this fosters racial discrimination. Thus, this court is convinced that race was a factor (possibly not the only factor) in the termination of Claude Long.

■■ Several other matters require discussion and disposition. Ford does not contend that 42 U.S.C. § 1981 does not apply to contracts pertaining to employment. That point, in any case, is well settled. Sanders v. Dobbs Houses, Inc., 431 F.2d 1097 (5th Cir. 1970); Waters v. Wisconsin Steel Works of International Harvester Co., 427 F.2d 476 (7th Cir. 1970), cert. den. 400 U.S. 911, 91 S.Ct. 137, 27 L.Ed.2d 150; Rice v. Chrysler Corp., 327 F.Supp. 80 (E.D. Mich.1971). These same cases do, however, meet one of the arguments advanced by Ford; namely that state action is required for the application of this provision. The cases cited above— *Rice, Waters* and *Sanders*—clearly stand for the proposition that Section 1981 applies to private as well as public employment discrimination.

The holding of these cases is supported by the Supreme Court decision of Jones v. Alfred H. Mayer, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968). In *Jones*, the Supreme Court decided that Section 1982 applied to acts of purely *private* discrimination. Since Section 1981 was taken from the same clause of that Civil Rights Act of 1866,[2] it is obvious that the decision in *Jones* applies as well to cases brought under Section 1981. See *Jones, supra* at 422, 88 S.Ct. 2186. In *Jones* (at 434, 88 S. Ct. at 2200), the Court referred to the congressional debates on the measure, stating, ". . . it seemed evident that, with respect to basic civil rights, . . . Congress must provide that 'there be *no* discrimination' on grounds of race or color."

■ The argument that Title VII of the Civil Rights Act of 1964 pre-empted or impliedly repealed Section 1981 is equally without foundation. See Boudreaux v. Baton Rouge Marine Contracting Co., 437 F.2d 1011 (5th Cir. 1971). "Title VII is in our view 'a continuation of, and not a substitute for,' § 1981." Young v. I. T. T., 438 F.2d 757, 764 (3rd Cir. 1971).

■ Ford's further contention is that some proof of intent or motivation to discriminate racially must be shown. Mr. Justice Clark answered that argument concisely and succinctly in Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). He stated: "It is of no consolation to an individual . . . that it was done in good faith." While Mr. Justice Clark's statement pertained to a "state action" civil rights suit under the Fourteenth Amendment, its import would apply equally well to a Section 1981 action. In Banks v. Perk, 341 F. Supp. 1175 (N.D.Ohio 1972), an action based, inter alia, on Section 1981, the

---

2. (It is perhaps worthy of note that the 1866 Act upon its original passage was vetoed by President Andrew Johnson, and subsequently repassed by the requisite majority in each house to override the veto. This is perhaps indicative of the depth of the congressional desire to make the national policy as strong as possible in this area.)

court quoted with approval a statement by the Honorable J. Skelly Wright:

" 'Whatever the law was once, it is a testament to our maturing concept of equality that, with the help of Supreme Court decisions in the last decade, we now firmly recognize that the *arbitrary quality of thoughtlessness can be as disastrous to private rights and to the public interest as the perversity of a willful scheme.'* " (Emphasis added.)

Hobson v. Hansen, 269 F.Supp. 401 at 497 (D.D.C.1967), aff'd sub nom., Smuck v. Hobson, 132 U.S.App.D.C. 372, 408 F.2d 175 (1969, en banc).

In Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), the Supreme Court in construing Title VII of the 1964 Civil Rights Act, stated: ". . . Congress directed the thrust of the Act to the *consequences* of employment practices, not simply the motivation." (Emphasis added.) At 432, 91 S.Ct. at 854.

This statement applies equally well to Section 1981. The Court of Appeals for the Sixth Circuit, also in a Title VII case, noted that it was not holding that actual or implied intent was necessary for recovery, but even if it were necessary, it could be inferred from conduct. King v. Laborers International Union of America, Local No. 818, 443 F.2d 273 (6th Cir. 1971). This holding is applicable here.

 It is not necessary to find intent for this court holds that proof of intent is not necessary if discrimination is actually proven. A similar decision was reached in Hawkins v. Town of Shaw, 437 F.2d 1286 (5th Cir. 1971). In any event, were it necessary to show intent a sufficient showing has been made by plaintiff to infer a requisite intent to discriminate.

 This holding is proper because "The 13th Amendment, as well as the Civil Rights Act of 1866 (42 U.S.C. §

1981 et seq.) 'nullifies sophisticated as well as simple-minded forms of discrimination' Lane v. Wilson, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281 (1939)." Newbern v. Lake Lorelei, Inc., 308 F.Supp. 407 (S.D.Ohio 1968). The phrasing of the Civil Rights Act of 1866 and the interpretation of it in the *Jones* case, *supra,* demonstrate the strongest possible statement of purpose to eliminate *all* racial discrimination in cases falling within the terms of the Act.

 It must be recognized that an inadequate job performance alone cannot justify what is otherwise a discriminatory termination. While Ford's policy (as expressed above in Exhibit 4) is admirable in its apparent desire to hire members of minority groups, the responsibility does not end there. Once hired, black people and other traditionally disadvantaged minorities *must* be given the job training necessary to enable them to perform their jobs.

As Mr. Ford recognizes and as the court notes, many minority groups have historically been discriminated against in many ways. To put a black person in a position for which he has been inadequately trained is not a way to eliminate racial discrimination, but rather an unthinking way to perpetuate it.

Thus, since race was a factor, Long's termination was impermissible. See Pughsley v. 3750 Lake Shore Drive Cooperative Building Co., 463 F.2d 1055 (7 Cir., 1972); Williamson v. Hampton Management Co., 339 F.Supp. 1146 (N.D.Ill.1972).

The only remaining matter is the question of an adequate remedy. It appears that Long is now in work which is satisfying to him. He does not seek reinstatement with Ford. The court is not satisfied that it possesses sufficient facts upon which to base an adequate remedy. Accordingly, the deputy court clerk will be instructed to set a date for a further hearing confined simply to this issue.