Gian C. SUD and Harish C. Sud,
Plaintiffs,

v.

IMPORT MOTORS LIMITED, INC., a
Michigan Corporation, dba Import Motors, Ltd., et al., Defendants,

v.

Lowell BLOSSOM and David Vance,
Intervenors.

No. K–74–118 C.A.

United States District Court,
W. D. Michigan, S. D.

April 30, 1974.

George H. Lennon, Kalamazoo, Mich., for plaintiffs.

Henry L. Guikema, Grand Rapids, Mich., for defendants Import Motors, Limited, Inc., Import Motors, Ltd. and Import Parts Corp., and Volkswagen Battle Creek, Ltd.

H. Van Den Berg Hatch, Marshall, Mich., for remaining defendants.

Peter A. Titta, Grand Rapids, Mich., for intervenors.

## ORDER AND PRELIMINARY INJUNCTION

FOX, Chief Judge.

The subject of this suit is a Volkswagen (hereafter VW) dealership, including the physical assets and good will, but more particularly including, for the purposes of this suit, the franchise to be a VW dealer in Battle Creek, Michigan. The plaintiffs, Dr. Gian C. Sud and his brother, Harish C. Sud, natives of India, allege that certain of the named defendants denied them the franchise on the basis of race and national origin, contrary to 42 U.S.C. Sec. 1981 and other federal and state statutory and constitutional provisions. Jurisdiction is properly asserted under 28 U.S.C. Sec. 1343(3) and (4).

The case is presently before the court on the plaintiffs' motion for a preliminary injunction. The course of dealing and legal relationships among the various parties are complex, and will be summarized as necessary for the purposes of this motion.

Dr. Sud and his brother Harish have been for some time permanent resident aliens of the United States. They are in the process of completing their residence requirements for naturalization as United States citizens.

Dr. Sud is the older of the two, and has been the moving force in the events leading to this suit. He holds a Ph.D. in biology from the University of Wisconsin and is currently an associate professor at Western Michigan University in Kalamazoo, Michigan. He is also principal owner or heavily involved in three multiple automobile dealerships, a VW, AMC and Jeep dealership in West Bend, Wisconsin; a VW, Datsun, and Suzuki Four-Wheel Drive dealership in Fond du Lac, Wisconsin; and a Mazda, Volvo dealership in Kalamazoo, Michigan. Dr. Sud first became an automobile dealer in Wisconsin in May of 1972, and, after some early difficulties long since overcome, he has been quite successful in each operation. Dr. Sud is also part owner of a real estate company which owns and leases business properties. Dr. Sud participates in the making of policy decisions, but ordinarily does not manage these individual enterprises on a day-to-day basis. It is important that Dr. Sud is very dark complexioned.

Harish C. Sud presently lives in Kalamazoo, and closely oversees all the Sud enterprises, including the automobile dealerships. Mr. Sud has a bachelor's degree in economics from Western Michigan University and had done graduate work in personnel management and business administration. He has been supervising the operations of one or more automobile dealerships since May 1972.

Both Dr. Sud and Harish Sud speak perfect English which does not sound noticeably "foreign" to the midwestern ear. They readily adopt and easily use the current business jargon, such as "track record."

There are three sets of defendants in this case. The first is Import Motors Limited, Inc., and a parallel organization, Import Parts Corporation (hereafter referred to collectively as Import Motors or IM), along with a recently formed dummy corporation, Volkswagen Battle Creek, Ltd. Import Motors is part of the VW distribution chain in the United States, being the wholesaler for Michigan and Indiana. Import Motors contracts with retail dealers and this contractual relationship, when established, amounts to a dealer franchise to sell VW's to the public. Import Motors has effective power to choose who will and who will not be VW franchisees in

its area, although its final selection for a particular dealership must be formally approved by Volkswagen of America. Volkswagen Battle Creek, Ltd., purchased the assets of the VW dealership in Battle Creek, Burgess Motors, Inc., on April 5, 1974, and now holds the franchise and operates the dealership. The company plans to convey the assets to Mr. Lowell Blossom and Mr. David Vance.

The second set of defendants is Burgess Motors, Inc., and its owners. Burgess Motors held the VW franchise in Battle Creek from June 15, 1973, to April 5, 1974, when it conveyed its assets to Volkswagen Battle Creek, Ltd.

The third set of defendants is Mr. Lowell Blossom and Mr. David Vance. Blossom and Vance have been approved by IM to be the new permanent VW franchisees in Battle Creek, although no formal contract to this effect has been signed. These defendants claim an equitable interest in the franchise, and were admitted as intervenors in this lawsuit on motion, with the court reserving the power to realign them as plaintiffs if it appeared appropriate to do so.

Because the focus of this suit is the awarding of franchises by Import Motors, IM's method of selecting new dealers is especially important. At the earliest stages, often before a dealership is even vacant, or "open," there are informal, in the sense of unstructured, contacts between IM personnel and those interested in acquiring a dealership. Mr. David Watson is IM's Dealer Organization Manager, and usually it is his department which is initially in contact with prospective dealers. Although there apparently is no set practice, IM will on occasion actively solicit formal application from those it believes may be especially qualified. Conversely, IM will discourage application, or not inform an interested party of an opening, if it does not wish to give the party further consideration. In many cases, one or more of those who do make some formal application are rejected immediately by Mr. Watson's department. The most promising candidates are interviewed and otherwise fully reviewed by the IM staff. This staff then makes its final selection.

There was testimony from members of the IM staff, and particularly from Mr. Robert Hooker, IM Vice President, as to the qualities IM seeks in a new dealer. In general, IM tries to find a person or persons who can operate successfully and who will maintain high standards. Adequate financing is, of course, absolutely essential. In addition, IM insists upon integrity, managerial ability, and, to a somewhat lesser extent in particular cases, experience. IM prefers to have an equity owner serve as the day-to-day manager of the business. Apart from adequate financing and equity ownership, none of these factors is quantifiable, and the combination of factors varies from selection to selection, according to the requirements for the particular dealership, the available applicants, and IM's business judgment.

Since at least January 1972, Dr. Sud has been in contact with Import Motors concerning the possibility of his acquiring a large dealership in the southwestern Michigan area. Dr. Sud has talked with IM officials concerning the possibility of opening a second VW dealership in Kalamazoo; concerning Dr. Sud's supplying capital for the construction of a building for a VW dealership in Michigan City, Indiana; concerning ownership of a VW dealership in Menominee, Michigan; concerning a VW dealership in northern Indiana; concerning the ownership of the Porsche-Audi dealership in Kalamazoo; and concerning the ownership of the VW dealership in Battle Creek which is the subject of this action. Between January 1972 and the bringing of this action, Dr. Sud has often contacted IM by letter or telephone, and has had several meetings with IM personnel, concerning the possibility of his acquiring VW interests. On the basis of IM business records and the testimony, the court concludes that at all times material to this controversy,

Import Motors, through its key personnel, was fully aware of Dr. Sud's intense desire to acquire a dealership in the southwestern Michigan area.

The parties focused on the VW dealerships in Menominee and Battle Creek, and the Porsche-Audi dealership in Kalamazoo as the most important subjects of negotiations, or non-negotiations, between Dr. Sud and Import Motors.

Menominee, Michigan, is a small city located on the Michigan-Wisconsin border in Michigan's upper peninsula, about 475 miles from Kalamazoo. In the late spring of 1972, Mr. Lawrence Goff, IM's Market Manager, informed Dr. Sud of the potential availability of the VW dealership in Menominee. During the summer and fall of 1972, Mr. Goff and Dr. Sud had several discussions concerning this franchise. In October, Dr. Sud informed Mr. Goff that he did not really want a dealership as small and unpromising as that in Menominee, but that he would take it as an accommodation to IM, and in order to establish a "track record" which would qualify him for a larger dealership closer to home. Although there was testimony that Dr. Sud could have had Menominee if he had wanted it, IM was apparently not prepared to implicitly obligate itself to give Dr. Sud a larger dealership in return for his taking Menominee. When Menominee finally became open in December 1972, Dr. Sud was not invited and did not in fact make formal application for the franchise.

In the winter of 1972–1973, IM began to move definitely towards the opening of a new Porsche-Audi dealership in Kalamazoo. There were several parties interested in the new dealership, but IM selected two for staff interviews. One was Dr. Sud. The other was a partnership composed of Mr. John Bylsma, who had been employed as zone manager for IM, and Mr. Louis Slavin, the past president of a paper company who had no previous experience as an automobile dealer. After the staff interview on January 30, 1973, the Bylsma-Slavin partnership was selected. Dr. Sud was informed that a better man had been chosen, but no other reasons were given for his rejection.

This rejection of Dr. Sud early in 1973 appears to have been a watershed in the Sud-IM relationship. Thereafter, Dr. Sud repeatedly contacted IM to express his interest, and to offer additional information or formal applications. IM repeatedly assured Dr. Sud that his interest was appreciated and that he would be contacted if anything came up. However, after his initial rejection, Dr. Sud was never again approached by IM, and never again asked for a full application, even though the data contained in the January 1973 application was soon completely out of date. The impression is that key members of the IM staff, and perhaps the whole IM staff,[1] had made a *personal* in contrast to an objective business judgment as to the suitability of Dr. Sud for a significant dealership. The record supports this impression.

In the spring of 1973, the Battle Creek VW dealership became open, but Dr. Sud was not informed. The dealership went to Mr. Thomas Burgess and others, who subsequently failed and are now defendants and cross-claimants in this case.

Also in the spring of 1973, Mr. Slavin backed out of the Bylsma-Slavin partnership so that Mr. Bylsma had to find new financing for the Porsche-Audi dealership. Dr. Sud proposed a Bylsma-Sud partnership, and, initially, this idea was favorably received by Mr. Bylsma. However, this partnership never materialized. The testimony was in conflict as to whether IM suggested to

---

[1]. See the memo dated July 26, 1973, from Mr. Calvin Verduin, IM's Sales Manager, to IM's President, stating Verduin's conclusion that Dr. Sud was not acceptable for the Kalamazoo Porsche-Audi dealership. Def. Import Ex. 3. Apparently Mr. Verduin thought that Dr. Sud was still being given active consideration as of this date.

Bylsma that Sud would not be acceptable, whether Bylsma merely assumed Sud would not be acceptable to IM because he had already been rejected once, or whether Bylsma himself decided he did not wish to be partners with Dr. Sud. Mr. Bylsma indicated in his testimony that IM obliquely suggested that Sud would not be acceptable. There is no dispute, however, as to the fact that IM did nothing to encourage the partnership, even though Dr. Sud was more experienced in the automobile business and better financed than the original partner, Mr. Slavin.

On May 16, 1973, Dr. Sud talked by telephone with Mr. Watson, IM's Dealer Organization Manager, concerning recent events. In a formal memo to the file, with carbons to staff members, Mr. Watson related the substance of the conversation:

"Dr. Sud wanted to know if this distributor had reason to feel that he was not qualified to be one of our dealers, either Volkswagen or Porsche Audi.

He considers the fact that he was not accepted for Kalamazoo Porsche Audi, nor advised of the Battle Creek Volkswagen opportunity, as grounds for his concern.

I assured Dr. Sud that we valued his application and interest highly. I also advised him that if we had any concern over his ability it came from the fact that his interest in Volkswagen dealerships in West Bend and Fon du Lac, Wisconsin and his proposed Mazda dealership in Kalamazoo might tax his physical and managerial ability without attempting another operation.

He wants to go on record as having an intense desire to become a dealer of Import Motors. If given an opportunity, he would divest himself of the Wisconsin operations to devote full time to Michigan interests.

I thanked him for his interest and told him we'd keep him abreast of future opportunities that might interest him." (Pl. Ex. 19.)

Mr. Watson's handwritten note of this conversation, intended for the president of the firm, is also in evidence:

"Had a nice chat with Dr. Sud today —He thought that he had fallen into disrepute with Import since he didn't get P/A Kalamazoo & wasn't informed of Battle Crk. opportunity.

I assured him that we treasured his application but thought his talent was spread pretty thin with 2 dlrships in Wisconsin and Mazda in Kalamazoo.

He's now all buttered-up & calmed down, - - -" (Pl. Ex. 26.)

The informal handwritten note reflects Mr. Watson's true attitude and confirms the conclusion that Key IM personnel had already decided that Dr. Sud was personally unacceptable, but that IM would not go on record as to this fact.

On or about February 1, 1974, Burgess Motors, Inc., the VW dealership in Battle Creek, decided to cease business because it had been losing money. This required the termination of the franchise contract with Import Motors, and the sale of the dealership assets, piecemeal or as a whole going concern.

When a dealer terminates his franchise, Import Motors has several major options. It can "take the dealer out under the contract," which means exercising IM's franchise contract option to remove all VW signs, to repurchase all VW automobile inventory and special tools and equipment. Since this results in a breaking up of the going concern, the terminating dealer typically realizes a very small return from the sale of his total business. It appears that Import Motors uses the express or implied threat to "take the dealer out under the contract" in order to keep the dealer in line after notice of termination, and in order to increase IM's effective power to select the successor dealer.

In recent years, Import Motors has also taken terminating dealers out under the "Bushouse Formula." The terminating dealer conveys all his assets to an IM dummy corporation. IM pays ac-

cording to a rather complex formula which does, however, recognize a going concern value. Subsequently, the IM dummy corporation conveys the assets at cost plus service fees to the persons IM has selected to be the new dealers. IM does not seek a profit on this "pour through" transaction.

A third major possibility is for the terminating dealer himself to find a buyer for his dealership, and sell the going concern directly to this buyer. The only restriction is that IM must approve the buyer as a new dealer for the buyer to get the VW franchise.

On February 5, 1973, Burgess Motors had a meeting with Import Motors. Burgess informed IM of its intention to quit the business, and requested IM to allow Burgess out on the "Bushouse Formula." IM insisted upon a formal termination, which was delivered on February 5 as required.[2] IM further stated that it would make an effort to find a new dealer, but that this would take time. No firm and binding commitment was made by either party to proceed by the Bushouse Formula.

On February 25, Dr. Sud heard from independent sources that Burgess wanted to sell the Battle Creek dealership. (Despite its pledge to keep him informed, IM never told Dr. Sud of the Battle Creek opening.) Dr. Sud approached the Burgess interests and made an offer which was accepted. Contracts were drawn up and signed by some of the parties on February 26. However, the contracts were not fully completed and signed by all interested parties until March 4. Both Dr. Sud and Harish Sud signed as purchasers of the enterprise. Because the contracts were not complete and probably also because of IM's implicit threat to take

Burgess out "under the contract," neither Burgess nor Dr. Sud informed IM of Sud's purchase until March 4. Although attempts were made to reach IM personnel on the morning of March 4, these were unsuccessful, and it was not until the afternoon that IM (specifically, Mr. Hooker, the Vice President) was told of the Burgess-Sud agreement.

The Burgess-Sud agreement called for the Suds to pay Burgess $20,000 or more than Burgess would get from IM under the Bushouse Formula. However, the contract was not to become effective unless the Suds were approved as a new dealer by Import Motors. On March 5, Mr. Hooker informed Dr. Sud that he would not be approved as the Battle Creek VW dealer, but no reason was given at that time. Subsequently, Dr. Sud was told that as of the morning of March 4, IM had made a "commitment" of the Battle Creek franchise to Mr. Lowell Blossom and Mr. David Vance, and that IM had to honor this commitment.

IM's Blossom-Vance "commitment" came about in the following manner. Mr. Blossom was already a VW dealer in Indianapolis, which is within IM's territory. When Burgess' termination notice of February 5 arrived in Watson's office at IM, Blossom happened to be present. Blossom was informed of the Battle Creek opportunity, and invited to apply. He was at the time Vance's partner in a Toyota dealership in Springfield, Ohio. Blossom contacted Vance, and the two requested IM to consider them for the Battle Creek opening. Blossom would put up most of the capital, with Vance having a minority interest plus a five-year buy-out agreement. Vance would be responsible for the management of the business. IM was favorably dis-

---

2. There was a suggestion during argument by Import Motors that Burgess' termination telegram was effective immediately, and was not simply a notice of termination under the franchise contract. However, this interpretation does not square with the facts. Burgess Motors remained in possession and control of the operating VW franchise until the

first closing of the Burgess-IM sale on April 5, 1974, when Burgess conveyed the business to Volkswagen Battle Creek, Ltd., IM's dummy corporation. The February 5 telegram was thus notice of termination and was not accepted as or treated as an actual termination effective immediately.

posed, and the IM staff had its final interview with the two on March 1. On the morning of March 4, before IM learned of the Burgess-Sud agreement, the IM staff decided to grant the franchise to Blossom and Vance. IM informed Vance of his selection on March 4, although it is not clear from the record whether Vance was informed before or after IM learned of the Burgess-Sud agreement.

Although Mr. Blossom might lose an investment opportunity if the Suds prevail in this suit, Mr. Vance is in a more difficult position. After graduation from high school in 1954, Mr. Vance began work as a car washer in a Chevrolet dealership. Since that time, he has worked himself up in various car dealerships and distributor organizations. Most recently, he held the Toyota dealership jointly with Mr. Blossom in Springfield, Ohio. When he was informed that he had been selected to be the new VW dealer in Battle Creek, Vance began to liquidate his Toyota enterprise. On March 6, he notified appropriate parties that he would not lease the real property necessary for the Toyota dealership. By March 8, Vance was informed of the Suds' intervention. (Pl. Ex. 17.) On inquiry to Import Motors, Vance was told that he had been selected for the Battle Creek franchise, and that IM would honor its commitment. Apparently on the basis of this renewed commitment, Vance, on March 11, formally terminated his Toyota dealership and finally liquidated the enterprise on March 30. He now has some funds which are to go into the Battle Creek dealership if he gets it, but otherwise is unemployed. If the Suds prevail in this suit and are granted the relief requested, Mr. Vance would be in a very difficult position indeed.

Since IM would not approve Dr. Sud to be the Battle Creek dealer, the Burgess-Sud agreement did not become effective. On March 25, pursuant to the Bushouse Formula, Burgess Motors contracted to convey all its assets to Volks-

wagen Battle Creek, Ltd., IM's dummy corporation. This suit was filed on April 2, but with the agreement of the parties the first closing of the Burgess-Import sale took place on April 5. Subsequent accountings and closings will take place as scheduled. It is agreed that this transaction will not affect the rights of the plaintiffs, or of Burgess Motors and its owners.

At present, the Battle Creek VW dealership for all practical purposes is wholly owned and operated by Import Motors' dummy corporation. It is proposed to transfer the dealership and franchise to the selected new dealers, Blossom and Vance, under the Bushouse Formula.

Dr. Sud and his brother allege in their complaint that they were denied the Battle Creek VW franchise "solely because they are not native born Americans of European extraction." They further allege that such discrimination is forbidden by, inter alia, 42 U.S.C. Sec. 1981, and the Michigan Constitution of 1963, Art. I, Sec. 2. The plaintiffs do not seek damages, but seek specific relief in the form of an injunction ordering Import Motors to execute and deliver to them a new VW dealership franchise contract in customary form. The plaintiffs also request the specific performance of the Burgess-Sud purchase-sale agreement of March 4, 1974, which, under present circumstances, would run against Volkswagen Battle Creek, Ltd.

Import Motors denies that it has been guilty of discrimination as alleged, and further denies that the plaintiffs have stated a claim upon which relief can be granted. Import Motors opposes the issuance of a preliminary injunction restraining the conveyance of the franchise and the assets of Volkswagen Battle Creek, Ltd., to Blossom and Vance, on the grounds that the plaintiffs have not made the requisite showing that a preliminary injunction is proper in this case. Import Motors also states that it does not wish to claim the profits or be responsible for the losses incurred by the Battle Creek dealership.

Burgess Motors was originally named as a defendant, but under present circumstances it is more properly considered a co-plaintiff. Burgess has filed a cross-claim against Import Motors for the $20,000 or more difference between what it would have received from the Suds and what it is receiving from Import Motors under the Bushouse Formula.

Intervenors Blossom and Vance are not alleged to be guilty of any actionable discrimination against the Suds. However, they, and especially Vance, allege an equitable interest in the Battle Creek dealership which arises from the detrimental reliance on the "commitment" made by Import Motors on March 4 and subsequently renewed on or about March 8. They allege that this equitable interest is superior to any rights the Suds might have in the franchise, so that even if Import Motors was guilty of actionable discrimination, the Suds cannot be preferred to Blossom and Vance. The plaintiffs reply that since Vance received actual notice of the Burgess-Sud contract on March 8, he cannot be considered an equitable purchaser because of any actions he took after that date. Blossom and Vance likewise oppose a preliminary injunction, but they are especially anxious to have a final decision on the merits.

The court observes that this case is immensely difficult on both the facts and the law. It is also immensely important not only for the parties but also for the automobile retailing industry and those who hope to enter it.

■ I. The defendants have questioned whether the plaintiffs have stated a claim upon which relief can be granted.[3] One aspect of this question, stated in terms of the present case, is, assuming the Suds have been discriminated against as alleged, whether this discrimination is actionable in this court.

Revised Statutes of the United States, Sec. 1977, 42 U.S.C. Sec. 1981 (and hereafter referred to as Sec. 1981), provides:

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

This provision was originally part of the Civil Rights Act of 1866, was re-enacted in Sec. 16 of the Civil Rights Act of 1870, became Sec. 1977 of the Revised Statutes of 1874, and is now codified as 42 U.S.C. Sec. 1981.

In searching for principled limits to Sec. 1981, several courts have stated that the provision extends only to discrimination on the basis of race, and does not extend to discrimination on the basis of religion or national origin. Many of the statements purporting to exclude discrimination on the basis of national origin from the proscription of Sec. 1981 have been made in the context of cases challenging discrimination on the basis of sex, and hence are clearly dicta. See, e. g., League of Academic Women v. Regents of the University of California, 343 F.Supp. 636 (N.D.Cal. 1972). Other such cases, however, may have involved stated claims of discrimination on the basis of national origin, although it is not clear that these claims were truly substantial. See, e. g., Schetter v. Heim, 300 F.Supp. 1070 (E. D.Wis.1970); Veres v. County of Monroe, 364 F.Supp. 1327 (E.D.Mich.1973).

Sec. 1981 by its terms applies to all persons within the jurisdiction of the United States, and thus plainly embraces aliens, in contrast to R.S. 1978, 42 U.S.

---

3. A motion to dismiss for failure to state a claim upon which relief can be granted may properly be treated as a motion for summary judgment under Rule 56. In considering this issue, the court takes into account testimony and exhibits submitted to date.

C. Sec. 1982, which applies only to citizens. The statute broadly provides that all persons should enjoy equal treatment with "white citizens." The standard by which treatment is to be measured plainly includes two elements, viz., race, or, more properly, color, and citizenship. Without attempting at this point a full analysis of the legislative history of Sec. 1981, the court observes that a statute which on its face embraces aliens and provides that they shall be given equal treatment with the majority group of citizens ought to be read to proscribe discrimination on the basis of national origin, unless a clear Congressional purpose to exclude such discrimination can be shown.

■■■ In this case, the Suds are neither white nor citizens. Assuming they were discriminated against as alleged, the court finds that the discrimination was among those types of invidious discrimination intended to be proscribed by Congress when it passed and re-enacted Sec. 1981. Cf., Sharma v. Opportunities Industrialization Center of Greater Milwaukee, 342 F.Supp. 209 (E.D.Wis. 1972); Rios v. Enterprise Association Steamfitters Local Union No. 638 of U. A., 326 F.Supp. 198 (S.D.N.Y.1971).

Another question is whether the court can issue the requested relief. The Suds have requested an injunction requiring Import Motors to execute a VW dealer franchise contract in the customary form. Should it appear appropriate, the court would undoubtedly have the power to issue such an injunction. 42 U.S.C. Sec. 1981 and 28 U.S.C. Sec. 1343(4) together give the court broad equitable authority to fashion a suitable remedy. See Jones v. Alfred H. Mayer Co., 392 U.S. 409, 414, n. 13, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968); Cf. Sullivan v. Little Hunting Park, 396 U.S. 229, 238–240, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969). There is nothing in the nature of a dealership franchise contract that would preclude the issuance of an injunction as requested. Both the legal and factual distance between an employer and employee is much less than between a franchisor and franchisee. Since courts can order broad injunctive relief to cure employment discrimination, no reason is perceived why, in an appropriate case, the court cannot order equally broad injunctive relief in the franchise situation.

II. On the basis of a review of the testimony and exhibits, and without intending to make a final judgment at this time, the court concludes that the plaintiffs have made a very strong case that they were discriminated against on the basis of color and national origin.

The Suds have demonstrated superior intelligence, imagination, energy, aggressiveness, integrity, financial solidarity, and business capability. Although they had some difficulties with their first automobile dealership in 1972, the Suds quickly corrected these problems to the satisfaction of the Chicago VW authorities. Since 1972, they have accumulated much experience and all their dealerships are now successful. In general, the Suds are well qualified to own and operate a large VW dealership in southwestern Michigan. Indeed, the burden of the testimony by IM officials was that they fully recognized all of the Suds' positive qualities, and that in general the Suds met the specific criteria IM uses for the selection of new dealers.

Why, then, has Import Motors treated Dr. Sud the way it has since early 1973, and why, if Dr. Sud is so well qualified in general, has he never been well enough qualified for a particular major dealership?

Import Motors' officials attempted to state specific reasons why they not only rejected Dr. Sud, but failed to give him serious consideration after early or mid-1973. The emphasis shifted from witness to witness, as though the witnesses and Import Motors were searching for a credible objective reason to support their actions. Yet every reason given turned out on further examination to be trivial at best, while most reasons just evaporated.

Mr. Hooker, the Vice President of Import Motors, testified that IM selects the "best" man or combination for each open point. Thus, said Mr. Hooker, it was not so much that Dr. Sud was rejected, as that others were selected as being better.

In the instance of the Porsche-Audi dealership, at least, it is possible to question whether IM did not in fact discourage or positively reject Dr. Sud after the original Bylsma-Slavin partnership collapsed.

But more important, IM seems never to have formally, directly, and seriously considered Dr. Sud after early or mid-1973. This failure to give a detailed reappraisal of Dr. Sud severely undermines IM's claim that it was always actively examining candidates and selecting the "best man". As stated earlier, IM seems to have made a judgment that Dr. Sud was personally unacceptable, so that the objective data and personal recommendations volunteered by Dr. Sud could make no difference. Apart from the small and strictly marginal Menominee dealership, which almost no one wanted, it seems that Dr. Sud could never be the "best man." The record strongly supports the inference that IM's personal judgment as to Dr. Sud was based on color and national origin.

Import Motors also stated somewhat vaguely that there was a difference of opinion between IM and Dr. Sud on how to run an automobile dealership. This seemed to boil down primarily to IM's preference for an equity owner on the premises as a full-time manager. This in turn was related to the belief that Dr. Sud's talents were spread too thin.

However, the preference for a full-time manager-owner is only a preference, and is not a sine qua non for a VW dealership. In terms of integrity, ability, and concentrated attention, the court cannot see that the combination of Dr. Sud and Harish Sud could leave much to be desired in terms of business performance. Moreover, Dr. Sud clearly expressed his willingness to divest himself of his other business interests if that was necessary to acquire a VW dealership in his area. Dr. Sud also expressed his willingness to conform to IM's requirements. But after early or mid-1973, IM never seriously explored the possibilities with Dr. Sud and his brother.

As late as April 2, 1974, Dr. Sud called Mr. Hooker, IM's Vice President, to assure Mr. Hooker, that if allowed to become the VW dealer in Battle Creek, he would not be a "maverick," but would, if chosen as a dealer, stay in line with all distributorship policies. Mr. Hooker replied that he did not believe that Dr. Sud was a maverick, and that no one from the Chicago area or IM had ever told him that Dr. Sud was a maverick. (Pl. Ex. 16.)

There were other statements in the record as to why Dr. Sud was unacceptable to IM,[4] but these will similarly not bear close scrutiny in light of surrounding circumstances.

So far as the record reveals, neither Import Motors nor any of its personnel explicitly stated to Dr. Sud or in internal memoranda that IM was rejecting Dr. Sud or refusing to consider him for a major dealership because of his color or foreign background. Furthermore, although IM has not a Black dealer in its territory, it does have two German-born, one Hungarian-born, and one Canadian-born dealer.

■ However, in sum, the record does reveal a great many of the classical characteristics of racial discrimination. The plaintiffs have thus made the requisite showing of likelihood of success on the merits under Sec. 1981 to enable the court to issue a preliminary injunction if it is otherwise called for. See Long v. Ford Motor Company, 352 F.Supp. 135 (E.D.Mich.1972); Gonzales v. Fair-

---

4. See esp. the memo dated July 26, 1973, from Mr. Calvin Verduin, IM's Sales Manager, to IM's President. Def. Import Ex. 3.

fax-Brewster School, Inc., 363 F.Supp. 1200 (E.D.Va.1973).

III. The parties are in strong disagreement as to whether the balance of equities, or inconvenience, is such that a preliminary injunction ought to issue.

At the present time, the Battle Creek Volkswagen dealership is held by Volkswagen Battle Creek, Ltd. Import Mortors, through its dummy corporation, was scheduled to transfer the dealership and franchise on or about April 24, 1974, to Mr. Blossom and Mr. Vance. By agreement with the parties, this transfer has not taken place pending the court's decision on the instant motion for a preliminary injunction. The basic issue is whether the court ought to preserve this status quo or allow the proposed transfer to take place.

If this court did not issue a preliminary injunction, and the proposed transfer took place, it appears that the impact on this suit might be significant. Blossom and Vance could acquire no additional strictly legal rights as a result of this transfer, since they would take with full knowledge of the plaintiffs' claim to the dealership. However, the proposed transfer would give Blossom and Vance title and possession, and they might argue that in equity their claim to the dealership was so much strengthened as against the Suds. Such an argument would not appear to be frivolous since there are significant costs involved in taking out an old dealer and putting in a new. Thus, if this court did not issue a preliminary injunction, it would tend to be tipping the balance of equities on the conflicting claims to the dealership in favor of Blossom and Vance, whatever the ultimate liability of Import Motors.

If the proposed transfer took place, and if the court ultimately decided for the Suds and ordered the dealership transferred to the Suds, the court would have to untangle the completed Volkswagen Battle Creek-Blossom and Vance transaction. If this occurred, the damages owed to Blossom and Vance by Import Motors as a result of this whole affair would probably be greatly increased.

Preserving the status quo would be against the express wishes of Import Motors, but would not appear to involve really serious difficulty for them. Import Motors is certainly capable of operating the dealership.

Preserving the status quo would adversely affect the positions of Blossom and Vance. In addition to the fact that the spring of the year is the best time to sell cars, Mr. Vance is currently unemployed. While he might become general manager of the Battle Creek dealership pending the resolution of this case, this would involve moving his family to Battle Creek on uncertain terms.

The problem with Mr. Vance's position is that he is also on uncertain terms if he takes title to the Battle Creek dealership before this case is finally decided, except insofar as he improves his equitable arguments at the Suds' expense.

Import Motors is fearful that if the preliminary injunction is granted the plaintiffs will be placed in an unduly favorable position. In particular, should the dollar be further devalued, or economic conditions otherwise worsen, then the Suds might no longer wish to have a VW dealership. The plaintiffs might withdraw their complaint, and Import Motors would be left with a dealership it could not sell, but which it might have sold but for the preliminary injunction.

However, the possibilities of such a drastic change in conditions in the immediate future are small. A final judgment on the merits would require the Suds to pay the Burgess-Sud contract price for the dealership, regardless of conditions at the date of the order.

Most of the arguments against the preliminary injunction are really arguments for an early decision on the merits. The court is fully aware of the necessities of the case in this regard, and will make every attempt to expedite the matter.

The court has concluded that it would be best to preserve the status quo in this case by issuing a preliminary injunction.

 The court observes that there may be a satisfactory middle ground here. The Suds have represented that they are willing to give up their Fond du Lac and West Bend VW dealerships as a condition to acquiring the Battle Creek VW franchise. If the Suds acquire the Battle Creek franchise, then Blossom and Vance cannot have it. They might be willing to take the Fond du Lac and West Bend dealerships. While the Chicago VW authorities would, no doubt, have to approve Blossom and Vance, this ought to be no problem. The parties will therefore be directed to explore these possibilities and to report back to the court within ten days after the entry of this order.

IV. It is therefore ordered that the defendant Volkswagen Battle Creek, Ltd., is hereby enjoined from transferring the stock of Volkswagen Battle Creek, Ltd., or the assets thereof except in the ordinary course of business, and is further enjoined from surrendering, transferring, or terminating the Volkswagen franchise agreement, contract, or understanding with Import Motors Limited, Inc., and Import Parts Corporation, under which it is currently operating.

It is further ordered that the defendants Import Motors Limited, Inc., and Import Parts Corporation, are hereby enjoined from terminating or transferring the Volkswagen dealership agreement, contract, or understanding now in force with the defendant Volkswagen Battle Creek, Ltd., in any way which would prejudice the claims or rights of the plaintiffs or of Burgess Motors and its owners.

It is further ordered that the defendants Import Motors Limited, Inc., and Import Parts Corporation are hereby enjoined from creating another Volkswagen dealership in the Battle Creek, Michigan, area.

It is further ordered that all parties to this suit are to have full access to the books, accounts, and business records of Volkswagen Battle Creek, Ltd., during the pendency of this action. All parties are enjoined to consult and negotiate in good faith toward agreement on the details of the operation of Volkswagen Battle Creek, Ltd., during the pendency of this action, except that the parties associated with Burgess Motors at their option may elect not to participate in these consultations and negotiations.

It is further ordered that the plaintiffs are to post a bond of $2,500.

It is further ordered that the parties are to explore settlement and compromise possibilities. Specifically, the parties shall consult and negotiate concerning the possibility that Mr. Blossom and Mr. Vance might acquire the Fond du Lac and West Bend VW dealerships from the Suds in the event that the Suds take over the Battle Creek VW dealerships by court order or otherwise. The parties are ordered to report the result of their consultations and negotiations to the court within ten days of the entry of this preliminary injunction.

It is further ordered that this preliminary injunction shall remain in effect until the final resolution of this case on the merits, or until further order of this court.