**Georgia JOHNSON, Plaintiff,**

v.

**MICHIGAN STATE UNIVERSITY,
Defendant.**

**No. G76–188 CA5.**

United States District Court,
W. D. Michigan, S. D.

Aug. 20, 1982.

John D. Pirich, Miller, Canfield, Paddock & Stone, Lansing, Mich., for plaintiff.

Oskar M. Hornbach, Spence, Martin & Hornbach, Lansing, Mich., for defendant.

## OPINION

HILLMAN, District Judge.

Plaintiff, Georgia Johnson, a black, female physician, brought this action against Michigan State University, pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* In her complaint, plaintiff alleges certain discriminatory acts were taken against her, but her principal claim is that she had been denied promotion and a grant of tenure because of her race, color and sex.

Dr. Johnson was denied tenure at the Department of Medicine at Michigan State University after having been a member of the department in a nontenured status for a probationary period of six years. She filed this suit against the University alleging that she had been hired as part of its affirmative action program to increase the number of blacks and women on its medical faculty. She claimed that she was never given any goals, guidance, objectives or directions as to what she should do to obtain

tenure; never given an evaluation of her performance; and, in effect, made her life miserable, not only in retaliation for her having filed a complaint with the United States Equal Opportunity Commission, but specifically was motivated by unlawful considerations of plaintiff's "race or color and/or sex."

She has requested this court to reinstate her to the faculty of Michigan State's College of Human Medicine with tenure, promotion, back pay, punitive damages, costs, attorney fees, and other appropriate relief.

Although filed in 1976, the case was reassigned to me shortly after I came to the court in late 1979. Plaintiff's complaint alleged claims under 42 U.S.C. §§ 1981 and 1983, 42 U.S.C. § 2000e, and under the Fourteenth Amendment. In an opinion issued October 8, 1980, this court held that the Eleventh Amendment barred the defendant's liability under sections 1981 and 1983, and under the Fourteenth Amendment. However, the court concluded that the Eleventh Amendment did not bar plaintiff's claim under Title VII.

The case was tried to the court in Lansing, Michigan, commencing August 24, 1981, and completed in Grand Rapids on September 11. The trial lasted ten days. Following the filing of briefs, closing arguments were heard on December 23, 1981.

After reviewing all of the evidence, including almost 100 exhibits, the court finds that plaintiff has failed to meet her burden of proof on her Title VII claim. Specifically, I am satisfied that plaintiff has failed to prove by a preponderance of the evidence that the decision to deny her tenure was in any way related to her sex or color. I further find her claim of failure to provide her with adequate office and secretarial help and failure to provide her with guidance, goals, objectives and direction violated Title VII of the Civil Rights Act to be without merit. Accordingly, judgment shall enter for the defendant for the reasons that follow, the same being Findings of Fact and Conclusions of Law pursuant to Rule 52(a).

In the middle sixties, Michigan State University opened a new Department of Medicine. By 1969, officials of the university were making a major effort to hire larger numbers of minorities to the faculty. Walter Adams, the Acting President of the University; Robert L. Green, Ph.D., Acting Director, Center for Urban Affairs; and Andrew D. Hunt, Jr., M.D., Dean, College of Human Medicine, all had a hand in recruiting plaintiff, a well-educated black, female medical doctor. At that time, plaintiff was 39 years of age. She is a graduate of Western Michigan University in Kalamazoo, as well as a graduate of the University of Michigan Medical School. At the time of her application to Michigan State University, she was a contractual part-time employee of the Ingham County Health Department in Lansing, Michigan.

Although in 1969 the University had not adopted a formal affirmative action program, an informal, voluntary plan was being put into place. Plaintiff was actively recruited because of her sex and color, although certainly these were not the only reasons. Dr. Scott Swisher, then Chairman of the Department of Medicine, apparently had serious misgivings about her academic qualifications and probably would not have hired her except for the "strong influence" upon him by the Acting University President and the Dean. It should be noted, however, that there is no evidence to support the claim that she was not hired in good faith, or that the University did not have a legitimate expectation that she would ultimately be promoted into a tenured position. She had little if any teaching experience, lacked graduate and professional training as well as professional recognition normally expected of tenured faculty in a medical school.

The College of Human Medicine had a contractual relationship with the Olin Health Center, which is a major health service for Michigan State students and faculty. Dr. Johnson was hired in a dual capacity; fifty percent of her time was to be used as Assistant Professor in the Department of Medicine, and the other half as a staff physician at Olin Health Center.

Under the Published Faculty Handbook, an assistant professor who has not served previously at Michigan State University, is appointed for a probationary period of three years. She may be reappointed for a second term of three years. Should she be reappointed for a third term at that rank, tenure will be granted. Likewise, if she is not reappointed at the end of the two probationary terms, it amounts to a dismissal. Appointment periods are calculated from September 1 of the year in which the appointment is effective.

Pertinent provisions of the Academic Personnel Policies as set forth in the Faculty Handbook, are as follows:

*"Appointments in the Tenure System*

Recommendations for faculty appointments originate in the department and are reviewed successively by the dean, the Provost and the President who make the final recommendation to the Board of Trustees for action.

Appointments to the ranks of professor, associate professor, assistant professor, and instructor normally are made under the provisions of the Michigan State University tenure system. Note: Since the *Operating Principles* of the tenure system specify how the appointment periods are calculated and the policies for the review of appointments, the appointment forms should not list an ending date.

\* \* \* \* \* \*

An assistant professor who has not served previously at Michigan State University is appointed for a probationary period of three years. He may be reappointed for an additional probationary period of three years. If he is reappointed a second time at that rank, tenure will be granted. If at any time during these two three-year periods he is promoted to the rank of associate professor, tenure will be granted.

\* \* \* \* \* \*

e) If a faculty member who was recommended by his department chairman and dean is not reappointed, and/or if proper notification, as stated in d), is not given, an extension of one year is automatic, and the faculty member shall consider this arrangement as official notification of separation from the University at the end of the one-year extension.

\* \* \* \* \* \*

g) Questions about the interpretation of the tenure regulations, or about the solution of tenure problems arising from situations not specifically covered in these regulations, are referred to the Faculty Committee on Tenure. The Committee after thorough study submits its recommendations to the President or other appropriate administrative officer or body. In every case the final decision rests with the Board of Trustees.

*Tenure Action and Promotion*

Recommendations for actions under the tenure system and for promotions in rank are made in the department and reviewed successively by the dean, the Provost and the President who make the final recommendation to the Board of Trustees for action. Since extensive information is needed to make an adequate evaluation of the productivity of each faculty member to be recommended for reappointment, tenure, or promotion, a comprehensive form has been developed which provides space for reporting activities; viz., instruction—undergraduate, graduate, academic advising; research—creative and scholarly; public services—extension and/or continuing education; international program assignments—committee and administrative services; and other evidence of merit. No one person is required or expected to become involved in every activity. Sample copies of the form are available in the Provost's Office.

\* \* \* \* \* \*

The college or university teacher is a citizen, a member of a learned profession, and an officer of an educational institution. When he speaks or writes as a citizen, he should be free from institutional censorship or discipline, but his special position in the community imposes special obligations. As a man of learning and an educational officer, he should remember that the public

may judge his profession and his institution by his utterances. Hence he should at all times be accurate, should exercise appropriate restraint, should show respect for the opinions of others, and should make every effort to indicate that he is not an institutional spokesman.

\* \* \* \* \* \*

*Statement on Non-Tenured Faculty*

The following policy statement was approved by the Academic Council May 7, 1969, the Academic Senate May 26, 1969, and the Board of Trustees April 17, 1970.

Recommendations for actions affecting the appointment, reappointment or promotion of faculty members under the tenure system must be in accord with the provisions of the tenure system.

At the level of the basic administrative unit, judgments on professional competence, academic potential, and compatibility of nontenured faculty are made by the responsible administrator after consultation with the tenured faculty and or other duly constituted group specified in the bylaws of that basic administrative unit. Recommendations for reappointment, tenure, or promotion are reviewed successively by the dean, the provost and the president, who makes the final recommendation to the Board of Trustees for action.

Each basic administrative unit shall base its judgments on criteria and procedures that are clearly formulated, objective and relevant. These criteria and procedures shall be known to all members of the basic administrative unit. If appropriate, the responsible administrator may supplement information required for these judgments by consulting with representative non-tenured faculty, students and/or qualified individuals outside the basic administrative unit. Review procedures shall be described in its bylaws and shall include a means by which the faculty member is evaluated and informed annually of his progress. These bylaws shall provide for a designated group to make recommendations with respect to reappointment, tenure, or promotion. Procedures shall also exist by which the faculty member may confer with this sub-group before a decision is made in his case.

Decision not to reappoint a non-tenured faculty member does not necessarily imply that the faculty member has failed to meet the standards of the University with respect to academic competence and/or professional integrity. This decision may be contingent, wholly or in part, upon the availability of salary funds and/or departmental needs. The decision not to reappoint a non-tenured faculty member does not require action by the Board of Trustees. In the case of a non-tenured faculty member within the tenure system, notification is required as set forth in the *Operating Principles of the Tenure System*. Such decision is made at the level of the basic administrative unit. Upon written request of the faculty member, the administrator of the basic administrative unit making the decision shall transmit in writing the reasons for the decision.

If a non-tenured faculty member believes that the decision not to reappoint has been made in a manner which is at variance with established evaluation procedures, he may, following efforts to reconcile the differences at the level of the basic administrative unit and the dean of his college, submit a written petition to the University Tenure Committee for a review of his case. The University Tenure Committee shall establish appropriate procedures for review of each such case.

When reason arises to consider dismissal of a non-tenured faculty member before the expiration of his term of appointment, the procedures to be followed shall be identical with those established for the dismissal of a tenured faculty member.

*Tenure Action and Promotion*

Recommendations for actions under the tenure system and for promotions in rank are made in the department and reviewed successively by the dean, the provost and the president who make the final recommendation to the Board of Trustees for action. Since extensive information is needed to make an adequate evaluation of the productivity of each faculty member to

be recommended for reappointment, tenure, or promotion, a comprehensive form has been developed which provides space for reporting activities: viz., instruction— undergraduate, and graduate; academic advising; research—creative and scholarly; public services—extension and/or continuing education; international program assignments; committee and administrative services; and other evidence of merit. No one person is required or expected to become involved in every activity. Sample copies of the form are available in the Office of the Assistant to the Provost, 310 Administration Building, 5–1526."

Upon undertaking her duties, Dr. Johnson was given a copy of the Faculty Handbook, Rules of Tenure and an "Information Form for New Appointments," the latter spelled out her duties at Olin Health Center, teaching responsibilities and expectation of her participation as a "clinic coordinator" at two local Lansing hospitals. Dr. Johnson came to MSU with a background of clinical training in internal medicine and it was anticipated that this experience would be helpful, not only at Olin, but in the University's plans for expanded clinical work in the local Lansing hospitals.

From 1969 to 1971, no serious problems occurred concerning Dr. Johnson, and in October, 1971, Dr. Swisher, the Department chairman, recommended her reappointment as an assistant professor of medicine for a second term of three years, that is from September 1, 1972, to September 1, 1975. The recommendation stated she had been performing "faithfully and effectively." In addition, it stated, "She has made significant efforts to develop herself as a teacher and as a clinician during this period of development."

Unfortunately, the relationship between plaintiff and the Department Chairman was not as serene as the recommendation appears to imply. Almost from the beginning, plaintiff believed she was being treated as an outsider and registered a series of complaints with the Department. Her irritation and displeasure increased particularly in 1972 and 1973 culminating in her being advised by Dr. Swisher on April 15, 1974, "It has been recommended by the Department Executive Committee that your appointment on the tenure track in this Department be terminated as of July 1, 1975. I concur with this recommendation and have forwarded the appropriate notification to the Dean and the Provost."

It should be noted that during the second probationary period (and prior to receiving her notice of tenure rejection) plaintiff experienced what she believed to be improper rebuffs and discriminatory treatment resulting in her filing grievances and complaints concerning her employment status with Michigan State University. She filed complaints with both the Michigan Civil Rights Department and the United States Equal Employment Opportunity Commission. Upon receipt of her dismissal notice, plaintiff grieved this decision within the University under its published rules and procedures. This second grievance expanded her initial complaint to include the action taken against her in failing to grant her tenure.

The departmental committee decided against Dr. Johnson, but recognized that she had never received the performance evaluations required by the University's own bylaws. The committee decided, however, that "an informal on-going evaluation" had occurred and thereby satisfied the bylaws' requirement for a detailed analysis of performance and statement of faculty member's goals. However, the University Appeals Panel, in April, 1975, concluded that the Department had violated University policy by not providing plaintiff with an annual evaluation. The Appeals Panel recommended that Dr. Johnson should receive an additional three year appointment as an assistant professor with the requirement that Dr. Swisher and Dr. Johnson develop specific goals and criteria for her progress toward tenure, a requirement of the University bylaws which had not been complied with through an informal on-going procedure. The University Appeals Panel concluded that specific goals and objectives had to be set and reviewed with the non-ten-

ured faculty members. This recommendation was accepted by the University. Thereupon, Dr. Swisher offered Dr. Johnson a "memorandum of agreement." Dr. Johnson refused to sign since the agreement, according to her at least, imposed vague obligations not applicable to all faculty members and which would have required a third probationary appointment, a procedure not used which would normally have resulted in automatic tenure for Dr. Johnson. Dr. Johnson's association with the University as a tenure track professor ended in October, 1975, with her gaining full-time employment at Olin Health Center.

Initially, plaintiff's problems centered around what might be termed "operational difficulties." She complained of inadequate office facilities, lack of proper secretarial support, and lack of proper telephone service. No doubt these were legitimate annoyances. However, the Department of Medicine, College of Human Medicine, was in its initial years of existence and experienced the usual growing pains and difficulties. In addition, plaintiff's office was located in the Olin Health Center and, therefore, she was physically separated from her department and had to travel to the Life Sciences Building for faculty functions. This arrangement unquestionably aggravated her discomfort. Plaintiff also protested her inability to vote in a faculty election. The problem, however, was traced to an inadvertent mistake by the office of the vice president for personnel and not the College of Human Medicine. There were other complaints. She testified she was left off an alphabetical listing of the total faculty of the University which, again, was compiled outside the College of Human Medicine. On another occasion, plaintiff claimed the Department Chairman would not take a seat next to her at departmental meetings, rather the faculty members would move over and make room for him in a different row of chairs.

█ Even assuming that each of these matters is evidence of unfair or improper treatment toward plaintiff, there is no evidence whatsoever that any such conduct was motivated against plaintiff either because she was black or because she was a woman. Other faculty members (white) also complained about the lack of adequate office and secretarial help. There was not a shred of evidence that the chairman's action in not sitting next to plaintiff was racially motivated.

The principal thrust of plaintiff's complaint, however, is of a more serious nature than the "operational difficulties" referred to above. It is her claim that she was hired (unknown to her) as part of an informal affirmative action program. That, although she did not purportedly possess the proper qualifications, the Dean, Acting President Adams and specifically, Dr. Swisher, Chairman of the Department of Medicine, apparently thought that through training and time Dr. Johnson could effectively pursue and attain tenure as a professor. Despite this it is Dr. Johnson's further claim that University officials never informed her of her status as an affirmative action appointee, never advised members of the college of such, nor did they provide her with special training to bolster her skills to that of a qualified applicant or specifically address any deficiencies through annual evaluations and follow-up remedial action.

It is clear from the evidence that in the early formative years, the College of Human Medicine was run on an informal, if not casual, basis. Dr. Swisher, by his own admission, was not one who believed in "one-on-one confrontations." The Department was small, the faculty was in daily contact, and it was believed that learning and progressing would come about by informal faculty exchange. In fact, in 1969, when plaintiff was hired, the regulations did not require an annual review (1968 Faculty Handbook). Plaintiff did, however, attend faculty meetings and faculty retreats where the objectives of the Department of Medicine and the individual faculty responsibilities were discussed. In addition, in the courses that plaintiff taught pre-teaching faculty conferences were held frequently, followed by a debriefing session where

strengths and weaknesses of the course were discussed.

As part of her duties, plaintiff participated in a satellite program at Flint, Michigan, and the Department Chairman worked with her on that project. He rode with her to Flint and participated with her in teaching, offering guidance and suggestions concerning her role as a faculty member. Likewise in these early years (1969–1970), Dr. Swisher conferred with plaintiff on an informal basis almost daily and discussed with her various problems concerning patients at the Olin Health Service. At that time both Dr. Swisher and Dr. Johnson had offices at Olin Health Service.

Plaintiff was not board certified at the time of her appointment. This was known to Dr. Swisher. Board certification was not an absolute requirement for tenure, but was generally understood by the faculty as being a major criteria. The subject was informally discussed off and on with plaintiff after she joined the faculty. It was not until the summer of 1975 that it became known that plaintiff had failed to pass her boards on three occasions. This was not known, however, at the time the decision was made to recommend that she not be reappointed. To become board certified is a natural and logical goal for any faculty member. It constitutes outside recognition of one's ability, talents and skills. This is well known to all physicians in the academic world and, although not an absolute requirement for tenure, it certainly is a fair and legitimate factor to consider along with other criteria.

Plaintiff's overall performance as a member of the faculty, other than her duties at Olin Health Service, was at best marginal. She was not receptive to constructive criticism, and when confronted, on occasion, became angry and appeared unwilling to accept advice. As a result, she found herself either at odds or in confrontation with other members of the faculty and on occasion with the students.

Dr. Robert Daugherty, now Dean of the Medical School at the University of Nevada, described plaintiff as abrasive, intimidating and authoritarian. He testified that, "Once you offered any constructive criticism to plaintiff, you would never do it again." According to Dr. Daugherty, in just ordinary discussions plaintiff would react as if she was discriminated against. Dr. Daugherty further stated that in the "Flint incident," the students complained about her method of teaching, refused to go on rounds with her and demanded a conference regarding plaintiff with the Department chairman, Dr. Swisher.

Dr. Elba Pung, a female faculty member, testified that she was in charge of the Fundamentals of Patient Care course in which plaintiff participated in Grand Rapids. One aspect of the course was to have a student give a presentation on a patient in the presence of faculty members with expertise in social work, psychiatry and internal medicine. Plaintiff was assigned to fulfill the role of the internist. Dr. Pung testified that plaintiff interrupted the student several times, that there was an angry exchange in which plaintiff indicated that she was the boss and in charge. Dr. Pung testified that an angry confrontation took place in public, and that plaintiff called the student a "bigot" in public.

In an effort to utilize her clinical talents and to broaden her experience, plaintiff was also given an opportunity to participate in and develop a project entitled the Adolescent Service. Plaintiff and Dr. Mary Ryan-Miles were initially appointed as co-directors. Thereafter, at plaintiff's insistence, she was appointed sole director of the Adolescent Service. Under plaintiff's leadership, the Adolescent Service was not a success. Dr. William Weil testified the Service never developed to a point where it could be used as a service where medical students could be taught. Dr. Weil stated in his letter dated February 12, 1974, it was impossible to continue the Adolescent Service because plaintiff did not have the capacity to administer a combined program. Plaintiff had been given assistance and advice in the development of this program not only by Dr. L. George Suhrland, Chairman of the Promotion Committee, and Dr. Weil, but also by Dr. Swisher.

Despite Doctors Weil, Swisher and Suhrland's advice and guidance, the adolescent program failed under plaintiff's leadership and was then turned over to Dr. Michael Faber. Under his leadership, the adolescent program became a success.

After Dr. Faber was put in charge of the program, plaintiff was asked to participate and assist Dr. Faber, which plaintiff refused to do. Apparently, plaintiff was not willing to participate in the program under Dr. Faber's leadership, prompting Dr. Swisher to write to Dr. Faber that in the event plaintiff did not promptly indicate willingness to participate, she would be relieved of all further responsibility in the area and a new member of the department would be assigned.

As in most disputes, there are two sides. Dr. Johnson believed that she was being mistreated, misunderstood and discriminated against. The above illustrations are intended only to demonstrate the problems and friction that existed within the faculty and not necessarily to assign blame. In any event, this friction and ultimate poor communication undoubtedly led to another major complaint of plaintiff, to-wit, she was not given an annual evaluation which, presumably, would inform her of her progress toward tenure. The Appeals Panel agreed with her on this charge. As stated in its opinion, page 10:

"The *Faculty Handbook* 1971/72 is quite clear, there must be an annual evaluation of all non-tenured faculty which informs them of their progress toward tenure. It need not be in writing, it need not be confrontational or adversarial, it should be honest, serious and informative to the faculty member. The entire thrust of the 'Statement on Non-Tenured Faculty' is to protect non-tenured faculty members from the uncertainties of casual, informal, smiling inquiries as to their activity by a department chairman. Such inquiries can easily mislead a faculty member; he or she may take the casual inquiries as just that, and not as any indication that his or her tenure is in jeopardy unless there is an improvement or alteration of performance. The 'Statement' is designed to enable each non-tenured faculty member to know, as well as it can be known, what his prospects are for achieving tenure and to ensure that each department conducts careful annual reviews of its non-tenured faculty.

That Dr. Swisher did not find an annual evaluation procedure suitable for his department and that it was therefore not done for any faculty member is not an adequate defense. The directive is not permissive, it is mandatory.

The Appeals Panel over-rules the Department Grievance Committee on this issue and finds that the only reasonable conclusion that can be drawn from the evidence is that Dr. Johnson was not afforded the protections of the 'Statement of Non-Tenured Faculty.' There is a clear violation of University policy."

When plaintiff was hired in 1969, the regulations did not require an annual review. Thereafter, in April of 1970, the Statement on Nontenured Faculty in the tenure system was adopted by the Board of Trustees. This policy statement appeared in the Faculty Handbook, 1971–72, which was distributed to the faculty in 1972. A formal annual review, in writing and in a confrontational style, was not implemented on a University-wide basis until the central administration issued a set of model bylaws in April of 1976. Formal annual reviews did not take place until 1977–78, well after the decision was made not to grant plaintiff tenure. Dean Weston, Dr. Weil and Dr. Suhrland testified that the College of Human Medicine did not have formal, annual reviews until 1977–78. The College of Human Medicine was not the only college that was dilatory in implementing the formal annual review in the late 70's. All other colleges and departments were in the same position.

The reasons for the delay of the implementation of the formal annual review were various, i.e., interpretation, applicability to new faculty only?, lack of a time schedule for implementation, and the natural inertia of the faculty in resisting a change in procedures.

However, based upon plaintiff's own testimony and the witnesses who testified for defendant, plaintiff was not treated any differently than any other faculty member. There is no testimony, not even an allegation by plaintiff, that other members of the faculty of the College of Human Medicine and/or the Department of Medicine were given annual reviews, and that she was not. The uncontradicted fact is that no one was given a formal, annual review until the late 70's, after plaintiff had been denied tenure.

Instead of the formal, annual review, the Department of Medicine and College of Human Medicine, along with all colleges of Michigan State University, engaged in decentralized peer review. This was accomplished by reviewing the progress of the faculty members through periodic discussions with the Department chairman, in group meetings and individually, to guide the faculty in development of programs, in an evaluation of how programs and various activities were proceeding, and in the development of suggestions for improved performance. These evaluations were periodic, unscheduled, informal, and in accordance with the academic tradition of longstanding. Historically, the small size of the Department of Medicine made it easy and convenient (or so it was believed) for all members and the Department Chairman to be appraised of the activities of every other member. Dean Hunt testified: "Nobody in my whole career ever sat down with me for a formal, annual review." However, as pointed out by the Appeals Panel, such a laissez faire attitude can be destructive and, in this case, may well have worked against Dr. Johnson. Nevertheless, such conduct is not actionable under Title VII, unless it is motivated by race and/or sex discrimination.

The central provision of Title VII, 42 U.S.C. § 2000e–2(a), on which Dr. Johnson principally relies, provides:

"(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

In her complaint, plaintiff has alleged a number of specific acts which she claims "were motivated by unlawful consideration of plaintiff's race or color and/or sex."

Initially, the question is raised whether these claims are to be analyzed under the disparate treatment test of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), or under the "disparate impact" test of *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), or under both. The traditional definition of these theories is set forth in *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). There, disparate treatment is said to define a situation where "the employer simply treats some people less favorably than others because of their race, color, religion, sex or national origin." On the other hand, a disparate impact situation is defined as one that "involves employment practices that are facially neutral in their treatment of different groups, but that in fact fall more harshly on one group than another and cannot be justified by business necessity."

Requirements of proof as well as standards to apply are different so it becomes important to know which under which theory or theories plaintiff is proceeding.

It is difficult to read the complaint in this case as anything but a charge that defendant treated plaintiff less favorably than others because of her race and sex. The complaint itemizes a series of isolated and sporadic discriminatory acts alleged to have been committed by defendant against plaintiff. She complains she was never given

any goals, guidance, objectives or direction and never given an evaluation of her performance. These are disparate treatment claims. The thrust of the complaint is directed at specific acts alleged to have been committed by defendant against plaintiff. But, even if the pleadings could somehow be construed to allege a disparate impact situation, we have in this case just one individual alleging to have been discriminated against. There is no group. There is no claim or proof that failure to set goals and to give instructions to· new associate professors (facially neutral) resulted in female/black, assistant professors receiving inferior and unequal treatment. For a similar situation, where the court refused to extend the disparate impact theory to a situation where only one individual was alleged to have suffered any legally cognizable harm from the actions charged to be discriminatory, *see, Wright v. National Archives and Records Service,* 609 F.2d 702 (4th Cir. 1979).

For the foregoing reasons, I am satisfied that the disparate impact theory is not properly before the court, not having been pled; but, in any event, conclude that the evidence fails to establish a prima facie case of violation under the disparate impact theory.

As stated above, plaintiff's case was pleaded and tried under a theory of disparate treatment. Simply stated, she contends that she suffered administrative indignity and was not given tenure because she was a black female. Under this theory, plaintiff is obligated to prove that the defendant intentionally discriminated against her. *Grano v. City of Columbus,* 637 F.2d 1073 (6th Cir. 1980).

The appropriate legal standard for "the order and allocation of proof in a private, non-class action challenging employment discrimination" was established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 800, 93 S.Ct. 1817, 1823, 36 L.Ed.2d 668 (1973). *See also, Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981), where in a recent deci-

sion, the Court discusses further the allocation of the burden of proof in disparate treatment cases. Justice Powell, speaking for the Court, explained that a Title VII plaintiff has a burden of proving by a preponderance of the evidence a prima facie case of discrimination. If the plaintiff succeeds, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the disputed employment action. If the employer carries this burden, the plaintiff must then be allowed to prove, if she can, by a preponderance of the evidence that the employer's reasons were a mere pretext for discrimination. It should be noted that Justice Powell insisted that the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against the employee remains at all times with the employee in a Title VII action.

In *McDonnell Douglas, supra,* where plaintiff alleged discrimination in hiring, the Supreme Court held that plaintiff established a prima facie case showing "(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applications; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. Under the facts of *McDonnell Douglas,* this initial showing was adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under Title VII.

In the case before the court, we are dealing with a decision to deny tenure in an academic setting and the elements of a prima facie case may well be different than in a business oriented situation. Tenure is more than just a promotion, such as in industry. It, in effect, amounts to a permanent contract without limitation, that is, until retirement. Denial of tenure, on the other hand, results not only in failure to obtain a promotion, but in termination of a faculty member's employment. As stated in *Huang v. College of the Holy Cross,* 436 F.Supp. 639 (1977):

"Since tenure is in effect a life contract until age 65, the decision to grant or withhold it is one of utmost importance to both the candidate and the college. Accordingly, a tenure 'position' does not 'open up' in a college in the same way as might a position in industry. Thus this court finds that the fourth element set out in *McDonnell Douglas* is not applicable."

*See also, Kunda v. Muhlenberg College,* 621 F.2d 532 (3rd Cir. 1980), where the court attempted to fit a prima facie tenure case into the *McDonnell Douglas* formula. There the district judge determined that it is necessary that a party alleging sex discrimination in the denial of tenure establish as three elements of her prima facie case (1) that she is a member of a protected group; (2) that she is qualified for tenure; and (3) that she was considered for and denied tenure. The district judge went on to state that due to the unusual nature of the tenure decision and the undeniable fact that qualified faculty members may be denied tenure due to reasons relating to the needs of the college, an additional element must be shown in order to establish a prima facie case. Some courts have found this "additional element" in the existence of significant procedural irregularities in the tenure process.

▮ Turning to the facts of the case before the court, I am satisfied that a prima facie case of sex discrimination in the denial of promotion and tenure has been established. Dr. Johnson is clearly a member of the protected class. Although her performance and qualifications are much in issue, nevertheless, she received in 1971 "good grades" and was recommended for reappointment to a second, three-year term as assistant professor. Likewise, plaintiff introduced a petition bearing a number of signatures by students attesting to her competence and ability. This evidence probably satisfies the second *McDonnell Douglas* requirement. Third, she was considered for and denied tenure. Whether any additional element in tenure cases is required or not is unclear. The Supreme Court has not so stated. However, in this case, a significant procedural irregularity occurred in the tenure process when the Department Chairman failed to have a one-on-one confrontation session with Dr. Johnson to discuss her performance and to appraise her of any deficiencies that she might have in order that she might have an opportunity to overcome them. This oversight in 1973 was in direct violation of the University regulations. Based on the above, I am satisfied that plaintiff has, in fact, established a prima facie case of discrimination.

Once a prima facie case has been proved, the employer must then articulate, if it can, a non-discriminatory reason why it failed to promote and grant tenure to plaintiff. In this case, the University has articulated such non-discriminatory reasons. As previously enumerated at some length, plaintiff's "operational difficulties" (lack of adequate office facilities, lack of proper secretarial support, and lack of telephone services) undoubtedly existed and unquestionably caused her anger and frustration. But the evidence demonstrated that practically everyone else in the Department experienced the same difficulties. Having an office in Olin Health Service, away from her colleagues, aggravated the situation. But, crucial to plaintiff's claim, no evidence was offered to establish that these "housekeeping" problems were in the slightest degree related to plaintiff's sex, race or color.

Defendant's response to plaintiff's prima facie case of discrimination in her failure to obtain tenure was simply that she was not qualified academically, or by temperment, or by ability, or by training to meet the tenure standards. At Michigan State University, research, teaching ability and service activities form the basis of any judgment for tenure and promotion. Of necessity, much of the evaluation is by subjective standards. There is no question, as some courts have pointed out, that discriminatory attitudes may be hidden subtly behind subjective standards. Yet, in this case, the almost unanimous opinion of all of the witnesses was to the effect that Dr. Johnson was not an effective teacher, she had more than her share of "run-ins" with students,

she was not effective in her relationship with other faculty members, she did not welcome or receive graciously constructive criticism, she made no effort to obtain outside recognition by preparing for and taking board certification examinations, and she was unable to assume a leadership role in peripheral medical school programs.

The College of Human Medicine has always placed high value on the teaching skills and contribution of an individual faculty member. Evidence in this connection involves the development of education programs, the development of educational-oriented materials such as self-instructional materials, evaluation instruments, self-assessment materials for student or faculty use.

Likewise, the element of service involves a broad range of activities, the most important of which is the delivery of skilled clinical services to patients in clinical care programs sponsored by the College of Human Medicine. In this respect, board certification is, in general, the principal minimum evidence of competence which was and is accepted by the Department. This is of particular importance because it is, in general, the criterion on which outside organizations such as hospitals and the individual physicians who might refer patients to the Department, would make a judgment as to the basic abilities of an individual faculty member who might be acting as a consultant or as a treating physician.

Not one witness testified as to plaintiff's qualifications for tenure. Not one witness even intimated that plaintiff's sex or color or race was in any degree considered in the adverse tenure decision. To the contrary, Dr. Suhrland, chairman of the Promotion Committee, testified that the accepted, established standards, e.g., research, teaching and service, were considered and that the decision not to grant plaintiff tenure was arrived at unanimously. He further testified that the Committee acted with regret, having in mind the impact that this decision would have upon plaintiff personally. He further testified that the grievances filed by plaintiff, the EEOC and MCRC complaints were not discussed. Further, plaintiff's race, sex and the affirmative action program were not specifically discussed. The recommendation of the Promotion Committee was concurred in by the Chairman of the Department of Medicine and by the Dean of the College of Human Medicine.

In the process of arriving at the decision not to grant tenure, a meeting was held between the Department Chairman, Dr. Swisher, the then Dean of the College, Andrew Hunt, the present Dean of the College, Don Weston, and the affirmative action officer of the University, Mary Sharp, all of whom testified. At this meeting, the academic soundness of the decision was never questioned. The decision was considered proper and legitimate, having the best interest of the students, the College and the University in mind. However, the political impact and consequences thereof were discussed in detail. A decision was reached that a stand must be taken based on the academic principles involved. It should further be pointed out that in reaching this decision, then Dean Andrew Hunt testified that he consulted with Tom Gunnings, the Assistant Dean in charge of continuing education and responsible for monitoring the affirmative action policies of the College of Human Medicine. He advised the Dean that the black faculty was not backing plaintiff, and that it was felt the decision not to grant tenure was proper.

The court is satisfied that the reasons for not granting plaintiff tenure, as articulated by defendant, were based on legitimate considerations and "not on an illegitimate one such as race." In summary, the defendant came to a hard and difficult decision that plaintiff did not possess the necessary qualities to be granted a life-time tenure contract on the faculty.

In rebuttal, plaintiff appears to admit that she, in fact, was not qualified but that her lack of qualifications is defendant's fault. That, unknown to her, she was hired as part of an informal affirmative action program and if she was unqualified when hired, the University had an affirmative,

legal obligation to give her special training and guidance to bring her up to the same track as other newly hired "qualified" assistant professors. No question this argument has a ring of fairness to it, but unfortunately in a Title VII suit, it lacks both legislative and judicial support. As I read Title VII, I find no such affirmative duty placed upon the defendant. Title VII is not an affirmative action program. It does not require persons to be accorded preferential treatment because of their race, color or sex. *See, Long v. Ford Motor Co.,* 496 F.2d 500 (6th Cir. 1974), where a black trainee, hired under an affirmative action program, complained that he received little or no training and because of the inadequacy of training and volume of work, the plaintiff fell behind in his work.

After being given an unsatisfactory performance review, the plaintiff was given the opportunity to resign or be fired. He resigned.

The lower court held that merely hiring a person into a new job is not equal opportunity. The district judge in his opinion granting relief to the plaintiff said:

"Black people, as a result of inferior education and housing and other deprivations, have historically been denied equal employment opportunities. Where they have begun to overcome this inequality through education, integration and new opportunities, merely hiring a person into a new job is not equal employment opportunity. If these people are not given adequate job training and are, as a result, terminated, then unequal employment opportunities still result."

*Long v. Ford Motor Co.,* 352 F.Supp. 135, 140 (E.D.Mich.1972).

However, on appeal, the United States Courts of Appeals for the Sixth Circuit overruled the lower court and held that an employer is *not* under any statutory duty or obligation to train black employees absent a showing that failure to do so constituted either dissimilar treatment from training whites received, or treatment similar on its face but dissimilar in its effects upon racial minorities. It held that an employer is not required to give any preferential treatment because of race. In quoting from *Griggs v. Duke Power Co., supra,* the court said at page 505:

" 'Congress did not intend by Title VII, however, to guarantee a job to every person regardless of qualifications. In short, the Act does not command that any person be hired simply because he was formerly the subject of discrimination, or because he is a member of a minority group. Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed. What is required by Congress is the removal of artificial, arbitrary and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification.' "

The Sixth Circuit then concluded by saying:

"Thus, it was error for the District Court to hold Appellant liable for a failure to train Appellee adequately, absent a showing that this failure constituted either dissimilar treatment from the training whites receive, or treatment similar on its face but dissimilar in its effects upon racial minorities and unfounded on business necessity."

With respect to Dr. Johnson, there was no evidence that she was trained inadequately whereas white, male co-employees were trained adequately. All training in the department admittedly was on a casual and informal basis. No distinction nor lines were drawn between males, females, white or black. In fact, however, some evidence was presented that the Department Chairman gave plaintiff more attention on clinical matters than he did to other newly-hired assistant professors. However, his major sin, as previously pointed out and emphasized by the Appeals Panel, was not specifically telling plaintiff that she had been an affirmative action hiree, and then failing to sit down with her on at least a yearly basis to go over her progress. But, again, there is not the slightest evidence that this failure was due either to her race, color or sex, or

that he sat down and had a one-on-one confrontation with any other members of the Department. It was simply not Dr. Swisher's modus operandi. He believed that the almost daily, informal contacts, faculty meetings and occasional retreats provided the same, if not more effective communication between him and the staff. No evidence was offered, statistically or otherwise, to establish that the Department's promotion system had a discriminatory effect on minorities. The fact that Dr. Johnson was not fired after the denial of tenure, but instead was offered a full-time position as a physician at the Olin Health Center belies any intention by the University to rid the Department of blacks and/or females. Instead, it would appear to confirm the University continued to want her services, recognized her clinical skills and abilities, but was of the opinion that her education, teaching skills, training and personality were not suited at that time to full-time teaching in the Department of Human Medicine. In fairness to the University, it should also be noted that even before the Appeals Panel decision, it had offered to plaintiff an extra year without the responsibility of most academic duties in order that she might prepare to retake the certifying examination in internal medicine offered by the American Board of Internal Medicine. This was rejected by plaintiff. Thereafter, the Appeals Panel issued its decision.

The Panel recommended that an exception to the tenure rules be granted by the Committee on faculty tenure in order to give Dr. Johnson an additional three-year probationary appointment. Further, the Appeals Panel recommended that plaintiff prepare, in cooperation with Dr. Swisher, a program of explicit objectives to be reviewed by the Advisory Committee, by which Dr. Johnson would annually be evaluated in terms of her progress toward tenure.

As testified to by Provost Lee Winder, this was an unusual action because of a three-year extension of the probationary period. Further, the University Tenure Committee approved the three-year additional probationary period, which, again, is an action by a separate University committee, and is unusual. There is no evidence whatsoever to suggest that any other faculty member received such an unusual three-year extension of the probationary period.

The College of Human Medicine and the Department of Medicine proceeded with the implementation of the Appeals Panel decision. The College had an opportunity to appeal the decision to the President of the University; however, it decided not to do so. As a result, the President of the University accepted and concurred with the Appeals Panel decision, and the decision thus became binding on all parties to the dispute.

Thereafter, through most of the summer of 1975, extensive negotiations were entered into by plaintiff and the University to work out appropriate goals and objectives in addition to granting her an additional three-year probationary period. Each party blames the other for the failure of these negotiations. Regardless, I am satisfied from the evidence that the University, perhaps belatedly, but nevertheless, did in fact make sincere, special efforts to assist plaintiff, thus belying her claim that being female and black she was on a track she couldn't get off and was doomed to failure from the start.

To conclude, plaintiff has failed to prove by a preponderance of the evidence that "operational difficulties," annoyances and inconveniences inflicted upon her after her appointment to the Department of Human Medicine, or the decision by the University not to grant her tenure, were the result of discrimination prohibited by Title VII. Or to put it another way, I am satisfied from the evidence that Michigan State University articulated legitimate, non-discriminatory reasons for not granting tenure to plaintiff and that she failed to prove that these reasons were a pretext for race and/or sex discrimination. Judgment shall be entered for defendant. Each party to bear its own costs.